**Electronically Filed
Supreme Court
SCWC-14-0001300
15-MAY-2020
10:32 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

JOHN LESLIE GALLAGHER,
Petitioner/Defendant-Appellant.

SCWC-14-0001300

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0001300; CR. NO. 13-1-0972(3))

MAY 15, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH RECKTENWALD, C.J.,
DISSENTING, AND WITH NAKAYAMA, J., DISSENTING

OPINION OF THE COURT BY POLLACK, J.

Under Hawaiʻi Rules of Evidence Rule 403, relevant evidence may be excluded if its probative value is, inter alia, substantially outweighed by the danger of unfair prejudice.  In this case, the defendant was charged with criminal property

damage in the second degree for damaging the complainants' vehicle. Over the defense's objections, the circuit court allowed the State to present evidence during trial of four prior incidents of aggressive and erratic behavior by the defendant directed at the complaining witnesses and their home. The circuit court also permitted the State to adduce evidence of the fear the complaining witnesses experienced as a result of the prior incidents and the various countermeasures they undertook in response to these incidents. The defendant was convicted as charged, and the conviction was affirmed on appeal.

On review, we conclude that the risk of unfair prejudice posed by the introduction of the four prior incidents substantially outweighed their limited probative value. We therefore vacate the Intermediate Court of Appeals' judgment on appeal and the circuit court's judgment of conviction and sentence, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

## I.    BACKGROUND & TRIAL

On December 30, 2013, John Leslie Gallagher was charged in the Circuit Court of the Second Circuit (circuit court) with criminal property damage in the second degree in violation of Hawaiʻi Revised Statutes (HRS) § 708-821(1)(b)

2

(Supp. 2012)[1] based on an incident that occurred on September 15, 2013.  Gallagher pleaded not guilty to the charge.

Prior to trial, Gallagher moved for "an order excluding from use at trial testimonial or documentary evidence relating to any other 'acts', bad or otherwise" involving him as irrelevant and unfairly prejudicial under Hawaiʻi Rules of Evidence (HRE) Rules 404 and 403.  Specifically, Gallagher sought to preclude "any testimonial or documentary evidence regarding alleged incidents" on four specified dates between May and September 2013 involving the two complaining witnesses or other persons.

Thereafter, the State filed two notices of intent pursuant to HRE Rules 404(b) and 608(b) stating it would rely on evidence of four prior incidents of "Harassment," one incident of "Harassment By Stalking," and one incident of "Harassment By Stalking, Simple Trespass, Criminal Tampering and Disorderly Conduct" that occurred between March 24 and September 19, 2013.[2]

---

[1]    HRS § 708-821(1)(b) provides in relevant part as follows: "A person commits the offense of criminal property damage in the second degree if by means other than fire: . . . . The person intentionally or knowingly damages the property of another, without the other's consent, in an amount exceeding $1,500[.]"

[2]    The notices collectively indicated that the State intended to rely upon six incidents, including one that occurred several days after the events giving rise to the case.  During the hearing on the motions in limine, however, the State informed the court that it did not intend to introduce any evidence of the last incident at trial.  Ultimately, the State elicited testimony regarding four of the prior incidents.

The State contended evidence of the prior incidents was relevant and admissible to demonstrate Gallagher's "motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, and/or absence of mistake or accident[,] as well as attacking his credibility as probative of untruthfulness."

At a hearing on the pretrial motions,[3] the State contended the sole issue at trial was going to be Gallagher's state of mind and his intent to cause the amount of damage to the complainants' vehicle that resulted from his actions on the night in question. The State asserted that evidence of the five prior incidents would show the conduct underlying the charged offense was not an isolated event, accident, or mistake and that the prior incidents culminated in the incident that resulted in the criminal property damage charge. The court asked the State to elaborate, and the State responded as follows:

> [B]asically what happened over the course of about six or seven months, this individual, from out of the blue, just started appearing at our complaining witness's house, essentially taking them to the point where they had to get a protective order against him, installed a video surveillance system on their house, basically because he had come around so many times threatening them . . . .

According to the State, it was important for the jury to hear about the prior incidents to understand Gallagher's state of mind when he damaged the complainants' vehicle.

---

[3] The Honorable Joseph E. Cardoza presided over the circuit court proceedings in this case.

In addition to his written motions in limine, Gallagher orally objected to the introduction of the prior incidents stated in the State's notices of intent, arguing that they were not relevant and were more prejudicial than probative because there would be no question as to his identity or whether his actions were the result of an accident or mistake. Evidence of the prior incidents, Gallagher maintained, did not go to the elements that the State needed to prove or to any defenses, and it did not fall within an exception to the rule against character evidence. Additionally, Gallagher argued that the prior incidents were dissimilar to the charged offense because they did not involve property damage. At the conclusion of the hearing, the circuit court denied the defense's motion to exclude the incidents, holding without any elaboration that the five prior incidents fell within the exceptions to HRE Rule 404(b). The court did not exclude any evidence regarding the prior incidents. The only matters excluded were opinions expressed by a complaining witness to the police regarding Gallagher's mental instability and statements that Gallagher had made that raised concerns about his mental health, both of which the State had no objection to excluding.

A jury trial commenced in August 2014. In its opening statement, the State informed the jury that the evidence would show that on September 15, 2013, Gallagher charged up the

5

complainants' driveway and kicked their vehicle multiple times on the passenger's side and then on the driver's side. The State related that the jury would hear and see that Gallagher's kicks left numerous dents on the complainants' vehicle. The State indicated that the jury was "probably going to hear the defense agree with pretty much 99 percent of what I just told you."

The State also told the jury that the night of the incident was not the first time the complainants had seen Gallagher. The defense's objection to this statement was overruled. The State proceeded to inform the jury that Gallagher had become an issue in the complainants' lives over the course of the six months preceding the incident, requiring the complainants to call the police numerous times, file numerous police reports, tint the windows of their home, and install an alarm system and a video surveillance system because of their fear. The prosecutor then told the jury that the Normans had actually sought a protective order against Gallagher. Defense counsel's objection to this statement was sustained, and the statement was stricken.

In the defense's opening statement, counsel stated that it was not disputed that Gallagher went to the complainants' residence on September 15, 2013, and kicked their vehicle. Defense counsel told the jury that the only issue in

dispute was the amount of damage that Gallagher intended to cause. The defense submitted that the evidence would show that Gallagher did not intend to cause more than $1,500 in damage and that he was not aware and did not believe that he would damage the vehicle to that extent.

Following opening statements, the State presented the testimony of one of the complainants, Jessica Norman (Ms. Norman). Ms. Norman testified that Gallagher first came into her life on March 24, 2013, which prompted Gallagher to renew his objection on HRE Rules 404(b) and 403 grounds. A bench conference ensued, and Gallagher argued that even if the prior incidents were relevant, the court was required to determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Gallagher maintained that identification was not at issue in the case, the prior incidents did not relate to Gallagher's state of mind as to knowing the amount of the damages, the prior incidents involved different facts, their introduction would confuse the issues and mislead the jury, and there was other evidence regarding the damages.

> [DEFENSE COUNSEL]: Judge, I would just object. I know this issue was raised at motions in limine, but I would just make an objection under 404(b). Your Honor, even assuming that these prior incidents are relevant, I believe the Court still has to determine whether there's unfair prejudice to my client and . . . whether the need for it substantially outweighs any danger of unfair prejudice.

7

> I would submit, you know, in this case, identification is not an issue. The prior incidents do not go to state of mind as far as knowing the amount of the damage. The facts are different, and . . . it would confuse the issue, mislead the jury.
> And . . . there's other evidence that can go towards the damages[.]

Gallagher indicated that he would like to register a running objection under HRE Rule 404(b) regarding any prior incidents. In response, the State contended that the "escalating series of events" were "highly probative" of Gallagher's mindset and his intent on the night of the incident.

The court overruled Gallagher's objections. The court reasoned that without evidence of the prior incidents, there was no context or explanation for the charged conduct because the parties were not otherwise acquaintances. Further, stated the court, the prior incidents were highly probative of Gallagher's intent to cause the kind of damage that occurred, and in any event the State had the burden of proving each element of the offense beyond a reasonable doubt regardless of whether some of them were conceded in the defense's opening statement. The court concluded that based on these reasons and the "entire 401, 403, 404 analysis" it would allow in the evidence of the prior incidents. The court did not indicate that it would not allow defense counsel's request for a continuing objection.

Following the bench conference, the circuit court issued a cautionary instruction to the jury regarding the

evidence of the prior incidents.  The court instructed the jury that the evidence could be considered only on the issue of the defendant's motive, opportunity, intent, preparation, or plan to commit the charged offense, and as to the identity of the person who may have committed the charged offense.  The court further instructed the jury not to consider the evidence for any other purpose or to conclude that the defendant was a person of bad character and therefore must have committed the charged offense.

Ms. Norman then testified in detail about four of her prior interactions with Gallagher.  Ms. Norman described her first encounter with Gallagher on March 24, 2013, when she saw him walking toward her home.  When she opened the front door and asked if he needed help with anything, Gallagher started screaming at her, saying: "You're not going to have your job by next week.  You hear me.  You're not going to have your job."  Ms. Norman testified that she immediately closed the door, explaining that she was "incredibly confused and scared," and that she thereafter filed a police report.

Ms. Norman then described an incident that occurred on May 9, 2013, testifying that she looked out her window after she heard yelling from the street.  She witnessed Gallagher in a confrontation with one of her neighbors, and when Gallagher saw her through the window, he started screaming obscenities at her

and ran toward the house. Ms. Norman explained that she called the police, but Gallagher was gone by the time they showed up.

Ms. Norman testified that she next saw Gallagher when she was again looking out her window on August 16, 2013. She stated that Gallagher was parked in his car in front of her driveway, and she witnessed him shake his fist at the house and give it "the finger" before speeding off.

Ms. Norman lastly recounted an incident that took place on September 4, 2013. She again saw Gallagher parked blocking her driveway, and this time she witnessed him make erratic movements as if he were going to ram his vehicle into the cars parked on the property. Gallagher again sped off, Ms. Norman testified, and he was gone by the time she called the police.

Ms. Norman stated that, in total, she filed six police reports against Gallagher from March 24 through September 15, 2013. These prior incidents terrified her because Gallagher appeared to show up more frequently and become more aggressive as time progressed. Ms. Norman testified that she did not know what Gallagher was capable of, and that she and her husband were scared for their lives. As a result of Gallagher's conduct, they tinted the windows on the ground floor of their home and installed an alarm system and a surveillance system with seven different cameras around the house.

As to the incident underlying the charge, Ms. Norman testified that on September 15, 2013, she went out on her lānai after she heard a car nearby and her dog began to bark. She saw Gallagher running at full speed toward the house screaming obscenities at her. He then started "wailing on the car," kicking and punching it approximately fourteen to sixteen times. Ms. Norman described the dents in the car as "massive," about four or five inches deep, and stated that Gallagher's kicks and punches were so loud that she thought he was using a baseball bat. Gallagher had also knocked the top of the back of the truck bed using his fist. Ms. Norman explained that, after he finished striking the car, Gallagher walked away, "flipped the house the bird," and then got in his car and left. During Ms. Norman's testimony, two CDs containing video surveillance footage of the incident were admitted into evidence and published to the jury; Ms. Norman provided a narration of the events shown in the footage while the video was played for the jury.

The State then called as a witness Garron Norman (Mr. Norman), Ms. Norman's husband, who testified that he came to know Gallagher "[f]rom a series of escalating events that were taking place at [their] residence." Because of these events that were happening throughout the summer and early spring, he and Ms. Norman were in a heightened state of alert on September

15, 2013. Mr. Norman recounted the events of that evening, which coincided with the testimony that had been given by Ms. Norman.

Mr. Norman testified that after the incident, he saw multiple dents all along the front quarter panels to the rear of the vehicle around the tailgate and up the driver's side of the vehicle. A series of photographs were admitted into evidence depicting the damage to the pickup, and Mr. Norman pointed out and described the dents, relating that there were probably about seven to eight "significant dents," approximately two to four inches deep, that were caused by Gallagher.

Gordon Yoshizawa, the owner of an auto repair shop, testified that he personally inspected the Normans' vehicle the day after the incident and estimated the cost of repairs to be $4,583.04. Additionally, Matthew Little, an automotive damage specialist for the Normans' insurance company, testified that based upon his inspection the estimated repair cost for the damage done to the vehicle was $3,036.26.[4]

After the State rested, Gallagher testified that in the early evening of September 15, 2013, he was at the house of a friend who lived next door to the Normans. He walked to the

---

[4] Mr. Norman stated that the Normans received an insurance payment of $2,536.26 for the damage, which reflected a $500 deductible.

Normans' house, lost his composure, kicked the passenger side of the Normans' truck three times, and then kicked between the rear wheel and the door on the other side of the truck a few times. According to Gallagher, he was 5 feet 9 inches tall, weighed 160 pounds, and wore a pair of cross-trainers on the night of the incident. He stated he used the inside of his foot and described the kicks as "more like a soccer kick." He said that the incident lasted for a total of ten seconds and that he only "put a couple scuff marks on the truck." Gallagher testified that he had a degree in automotive technology, the damage he caused amounted to only about $300 or $400, and a "detail job to buff it out" or a "wax job" would have taken care of the damage to the vehicle. Gallagher further stated that he did not intend to do extensive damage and disputed that his kicks left dents in the truck that amounted to $1,500 worth of damage.

During the reading of the jury instructions, the circuit court provided a general instruction on the use of evidence admitted for a limited purpose. The court then instructed the jury that the evidence of Gallagher's prior crimes or bad acts was to be considered only on the issue of his motive, opportunity, intent, preparation, or identity and not to

conclude that he was a person of bad character and therefore must have committed the charged offense.[5]

In its closing argument, the State indicated that the case boiled down to whether Gallagher intentionally or knowingly caused $1,500 worth of damage to the Normans' vehicle. The State argued that the evidence against Gallagher, including the prior acts Gallagher committed, was "very overwhelming." The evidence of the prior incidents, the State explained, was presented to show Gallagher's intent and the Normans' perception of Gallagher's state of mind. The State asserted that what occurred was not an isolated incident but instead was an escalating series of events that took place over six months. The jury was reminded by the State that it had heard from the Normans about the number of times Gallagher came into their lives, and from the Normans' perspective he was becoming more dangerous each time he showed up. The State highlighted the several countermeasures the Normans had taken such as installing a surveillance system and an alarm system and tinting the windows of their house. This was not an isolated incident, the State reiterated, and Gallagher was demonstrating increasing levels of anger and hostility. Gallagher intended to do as much

_____

[5] The court also instructed the jury on the elements of the included offenses of criminal property damage in the third and fourth degrees.

14

damage as he physically could on the night in question, the State argued, and his actions were "premeditated," "cold," and "calculated."

Defense counsel argued in closing argument that the only disputed issue in the case concerned Gallagher's intent regarding the amount of the damage he caused to the Normans' truck. While Gallagher admitted to kicking the Normans' vehicle, counsel maintained, it was not enough that Gallagher kicked the vehicle. The State also had to prove beyond a reasonable doubt that Gallagher acted with the intent or knowledge that he would cause over $1,500 in damage. Counsel argued that the truck already had scratches and dents and that Gallagher could not have intended to cause over $1,500 worth of damage, adding that the damage he did cause was only cosmetic in nature.

The jury convicted Gallagher as charged. Gallagher was sentenced to a five-year term of imprisonment consecutive to a term he was currently serving. Gallagher appealed from the circuit court's October 31, 2014 judgment of conviction and sentence.

## II.    ICA PROCEEDINGS

On appeal, Gallagher asserted that the evidence of the four prior incidents of his misconduct introduced at trial was irrelevant and far more prejudicial than probative.[6]  Gallagher contended that the circuit court's reasoning that the prior incidents would provide context was not one of the exceptions for introducing character evidence and that the evidence of the prior incidents was not relevant to any disputed issue. Gallagher submitted that the video footage and his own testimony eliminated any dispute as to his general intent to damage the property and there was no question as to identity, motive, opportunity, intent, plan, or preparation.

Additionally, Gallagher argued that the potential for unfair prejudice from the admission of the prior incidents substantially outweighed any limited probative value they may have had.  Gallagher contended that the need for such evidence was minimal because the State presented the testimony of the two complaining witnesses, photographs of the damage to the vehicle, and video footage that showed the incident from beginning to end.  The evidence of the prior incidents "probably roused the jury to hostility" against him and most likely elicited sympathy

---

[6]    Gallagher raised other issues to the ICA, but these issues are not raised on certiorari review.  They are therefore not addressed.

for the Normans based on their prior experiences with him,
Gallagher asserted, and thus such evidence was highly
prejudicial.

The State responded that evidence of the prior
incidents was relevant under HRE Rule 401 to provide context for
the incident underlying the charge, which made it more probable
that Gallagher intentionally or knowingly caused more than
$1,500 worth of damage to the Normans' vehicle.  The State
submitted that the evidence was also properly admitted under HRE
Rule 404(b) to prove that Gallagher intended to cause the amount
of damage required for criminal property damage in the second
degree and that his conduct was not an accident or mistake.
And, the State asserted that the evidence of the prior incidents
was admissible under the relevant factors of HRE Rule 403,
including that there was a substantial need for the evidence,
there was no alternative means of showing context, and the
evidence was not likely to rouse the jury to hostility against
Gallagher.

On December 20, 2017, the ICA issued a summary
disposition order.[7]  Citing HRE Rule 401, the ICA determined that
Gallagher was incorrect to assume that evidence is only relevant

---

[7]     The ICA's summary disposition order can be found at State v.
Gallagher, No. CAAP-14-0001300, 2017 WL 6507180 (App. Dec. 20, 2017) (SDO).

17

to prove matters in dispute. The State has the burden to prove beyond a reasonable doubt each element of the offense, the ICA stated, and Gallagher did not offer a stipulation as to any of the elements of the charged offense. In any event, the ICA added, Gallagher's intent was in dispute. Based on its review of the record, which included the giving of limiting instructions to the jury regarding the evidence of the prior incidents, the ICA concluded that the circuit court did not abuse its discretion in admitting such evidence.

Gallagher challenges the ICA's holding on certiorari review, arguing that the unfair prejudice caused by the introduction of the four prior incidents substantially outweighed its minimal probative value and had a tendency to suggest a decision based on an improper basis.

### III.     STANDARDS OF REVIEW

"[A] trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993) is reviewed for abuse of discretion." State v. Cordeiro, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002) (quoting State v. Torres, 85 Hawai'i 417, 421, 945 P.2d 849, 853 (App. 1997)). When such an abuse of discretion is identified, it is grounds to vacate a conviction unless it is harmless beyond a reasonable doubt. State v. Kazanas, 138 Hawai'i 23, 43, 375 P.3d 1261, 1281 (2016).

## IV.      DISCUSSION

### A. The Circuit Court Abused Its Discretion in Its Application of HRE Rule 403.

Over strong objections by the defense, the circuit court allowed the admission of four prior incidents that involved aggressive, obscenity-laden, and angry misconduct by Gallagher toward the Normans.  The State and its witnesses repeatedly characterized the conduct as escalating.  The testimony included the specific details of each incident in which Gallagher had harassed the family.  Ms. Norman testified that Gallagher's actions during the previous incidents terrified her and prompted the family to take a range of protective countermeasures, including filing six different police reports, tinting the windows in the garage and on the ground floor of their home, and installing an alarm and surveillance system.

Under HRE Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  In weighing the probative value versus the prejudicial effect of prior bad acts admitted for one of the purposes authorized under HRE Rule

404(b) (Supp. 2012),[8] we have stated that a number of factors must be considered, including

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

State v. Behrendt, 124 Hawai'i 90, 106, 237 P.3d 1156, 1172 (2010) (quoting State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992)).

While these factors provide guidance as to the elements to consider, the court's underlying HRE Rule 403 evaluation remains whether the probative value of the evidence of prior acts is substantially outweighed by its potential for unfair prejudice.  Each factor must therefore be considered in light of the purpose for which the evidence was offered--here,

---

[8]     HRE Rule 404(b) provides as follows:

(b) Other crimes, wrongs, or acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.  In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

to prove Gallagher's state of mind with respect to the extent of the damage caused to the Normans' vehicle.

As to the first factor, the strength of the evidence as to the commission of the other conduct, Ms. Norman testified that she witnessed firsthand Gallagher's behavior on the prior occasions, and Mr. Norman confirmed that there had been a "series of escalating events" involving Gallagher. Because Gallagher does not deny that the prior incidents occurred and submitted no contrary evidence, the first factor does not weigh against admittance.

With regard to the second and third factors--the similarities and interval of time between the crimes--Gallagher acknowledges the time that elapsed between the prior incidents and the one underlying the criminal charge in this case was arguably not long. But he argues that the prior incidents were not similar to the underlying incident, as they did not involve property damage.

Here, Gallagher's identity, actions, and general intent to do damage were not disputed.[9] The prior incidents were

---

[9] Justice Nakayama's dissent argues that "every element of the charged offense was 'at issue' for the purposes of" admitting the evidence of prior incidents under HRE Rules 404(b) and 403. Nakayama, J., Dissenting at 12 [hereinafter Dissent]. While it is true that the State must prove all elements of an offense, other bad acts are not admissible to prove an element when the element is not disputed in the evidence in the case. See, e.g., State v. Calara, 132 Hawai'i 391, 402-04, 322 P.3d 931, 942-44 (2014) (holding that two prior incidents of misconduct should have been excluded under HRE

(continued . . .)

therefore relevant only to demonstrate the degree of Gallagher's

hostility toward the Normans and thereby increase the likelihood

that he intended to do significant damage to their property.

---

(. . . continued)

Rule 404(b) because intent and lack of consent were not disputed); State v. Veikoso, 126 Hawai'i 267, 276-77, 270 P.3d 997, 1006-07 (2011) (concluding that evidence involving another complaining witness would not be admissible to prove identity because identity was not disputed); State v. Castro, 69 Haw. 633, 645, 756 P.2d 1033, 1042 (1988) (holding that, when "the identity of the perpetrator of the crimes was not denied, [] the admission of the other crimes evidence as proof of modus operandi," including plan and preparation, "cannot be justified"). Here, the element of identity and Gallagher's conduct were not only conceded by the defense in its opening statement and acknowledged by the State's opening statement, but the evidence of the conduct was recorded in a video and testified to by two eyewitnesses.

The dissent's contention that an unstipulated element "like identity" in this case renders the element in dispute for purposes of HRE Rule 404(b) analysis, dissent at 13 n.5, is contrary to both our caselaw, Calara, 132 Hawai'i at 402-04, 322 P.3d at 942-44; Veikoso, 126 Hawai'i at 276-77, 270 P.3d at 1006-07; Castro, 69 Haw. at 645, 756 P.2d at 1042, and to Professor Addison Bowman's evidence treatise, which we have cited for guidance in this area. Calara, 132 Hawai'i at 403, 322 P.3d at 943. As stated by Professor Bowman, "Assessment of the dispute factor thus requires consideration of the precise defensive claims being made in the case." Addison M. Bowman, Hawaii Rules of Evidence Manual § 404-3[3][E], at 4-62 (2018-2019 ed.). Here, Gallagher did not dispute he was the person causing the property damage and, in fact, admitted that he was.

Nevertheless, the dissent maintains that the prosecutor cannot know what a defendant will say, and Gallagher may have taken the stand and denied being the person who kicked the car. Dissent at 13-14 n.5. This type of justification would lead to the wholesale admission of propensity evidence. As Professor Bowman has aptly observed:

> Identity is always a "fact of consequence" in a criminal case because it characterizes the elemental proposition that the accused (not someone else) committed the crime. That being so, a proponent's assertion that evidence of another crime proves identity is not meaningful unless accompanied by some other theory that heightens probative value and takes the matter beyond mere propensity. This is because the direct inferential link between prior crime and identity, without an intermediate inference such as motive, plan, or signature, can only be understood in terms of "action in conformity therewith" on the present occasion. In other words, "identity," without more, is likely propensity in sheep's clothing.

Bowman, supra, § 404-3[2][F], at 4-55.

22

However, the closeness in time and alleged similarity between the prior acts and the incident giving rise to this case is at most only marginally probative of this point.

Ms. Norman testified that the prior incidents occurred at her residence over a six-month period starting on March 24, 2013, with the final incident occurring eleven days before the incident in this case. She further stated that the incidents involved Gallagher yelling obscenities at her, gesturing angrily toward her and her house, and making erratic movements using his car. The incidents shared some similarities in that they all occurred at the Normans' residence and involved hostile actions by Gallagher towards the Normans, but none of the prior incidents involved destruction of property. By contrast, the underlying incident in this case involved Gallagher causing property damage to the Normans' vehicle. Accordingly, the prior incidents, having not involved physical damage, had no relation to Gallagher's awareness or knowledge of the extent of damage his actions would cause in the underlying incident, and they were therefore not probative of this issue.[10]

---

[10] The state of mind requirement for criminal property damage may alternately be established by demonstrating that Gallagher had knowledge or awareness that his actions would cause damage in excess of $1,500. See HRS § 708-821(1)(b).

Further, when prior misconduct is similar to the current offense and is offered to confirm identity or voluntariness by establishing a common methodology or scheme, a close connection in time and nature is highly probative only because it increases the likelihood that the same actor committed both instances of misconduct. See, e.g., State v. Acker, 133 Hawai'i 253, 277, 327 P.3d 931, 955 (2014) (stating that prior incidents where defendants also robbed lone men, left them at remote locations, and escaped in their victims' vehicles were admissible to show common plan and lack of coercion); State v. Austin, 70 Haw. 300, 307, 769 P.2d 1098, 1102 (1989) (holding that the similarity between a defendant's earlier drug dealing and the drug dealing offense with which the defendant was charged was extremely relevant to prove both a plan and a common scheme). However, a close proximity in time and nature between the prior misconduct and the charged offense may also increase the likelihood that a jury will consider the previous conduct to conclude that the defendant has a propensity for committing such acts, which is a prohibited inference. See HRE Rule 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."); State v. Murray, 116 Hawai'i 3, 20, 169 P.3d 955, 972 (2007) (holding that "the risk of tainting the jury verdict with evidence of prior [misconduct] is of especial

concern when the current charge is for the same crime of which the defendant was previously" implicated).

Thus, when the evidence is not offered for a purpose for which similarity in time and nature is probative, a close unity between the acts potentially weighs against admitting the evidence when it increases the chances of unfair prejudice. See State v. Castro, 69 Haw. 633, 645, 756 P.2d 1033, 1042 (1988) (holding that because "the identity of the perpetrator of the crimes was not denied, [] the admission of the other crimes evidence as proof of modus operandi cannot be justified"). In this case, similarity as to location of all the prior incidents and as involving the same complainants, and the closeness in time of the prior incidents to the underlying offense, exacerbated the unfair prejudice as it increased the likelihood that the jury would conclude that Gallagher had a propensity for committing such acts while adding virtually no probative value as to the issue of Gallagher's intent to cause the amount of damage caused. Accordingly, because of the lack of probative value of the prior misconduct evidence and its accompanying risk of unfair prejudice, these factors--similarities of crimes and interval of time between them--do not weigh in favor of admission of the prior acts of misconduct.

The final three factors in our evaluation concern the need for the evidence and, relatedly, the availability of

alternative evidence on the same point, as well as the likelihood that the evidence will inspire ill-will in the jury toward the defendant. Castro, 69 Haw. at 644, 756 P.2d at 1041.

As discussed, the only disputed issue at trial to which the prior incidents were relevant was the extent of the damage Gallagher intended to cause or of his awareness of causing such damage. The occurrence of the prior incidents and their escalating nature were only marginally probative insofar as they demonstrated the extent of Gallagher's ongoing hostility toward the Normans and his general intention to cause damage to their property during the underlying incident. However, extensive surrounding details of the incidents had no bearing on this issue. Ms. Norman's testimony included a range of highly prejudicial information that was lacking in probative value as to Gallagher's state of mind, including the Normans' repeated calling of police regarding the incidents; their filing of six police reports involving harassment; the numerous protective measures installed in their home, including the tinting of windows and the installation of a surveillance system with seven video cameras and an alarm system; and--perhaps most prejudicial--the recounting of the Normans' ongoing fear of Gallagher and Ms. Norman's statement that the prior incidents terrorized her.

The circuit court concluded that "practically speaking, there aren't any other means or alternatives that would permit the explanation or background to what was going on, on the evening in question." However, even assuming that there was minimal probative value in admission of the prior misconduct, the State could have elicited a much less elaborate recounting of the prior incidents, greatly limiting testimony to the aspects of the incidents that ostensibly bore on Gallagher's state of mind. Mr. Norman, for example, testified that he came to know Gallagher "[f]rom a series of escalating events that were taking place at our residence." This testimony essentially encapsulated the relevant aspects of the previous incidents in that it demonstrated that Gallagher had repeated, escalating, hostile interactions with the Normans.

It is noted that the explanation concerning the prior interactions between the Normans and Gallagher did not require specific wording. The incidents could have been characterized by the prosecutor's questions as unwanted encounters, unprompted altercations, or any number of other terms. Regardless of the phrasing, testimony significantly more narrow could have been elicited to capture the contended relevance of the prior incidents while carrying none of the unfair prejudice that arose

27

from the specific descriptions of Gallagher's behavior and the fear and countermeasures described by the Normans.[11]

Further, again assuming some probativeness of the prior misconduct, the number of prior incidents should have been limited to the minimum sufficient to obtain the asserted probative value the conduct offered. Instead, four prior incidents were admitted, despite the lack of probative value of the multiple instances of prior misconduct. See State v. Kazanas, 138 Hawai'i 23, 43, 375 P.3d 1261, 1281 (2016) (holding it was an abuse of discretion to admit evidence of past abuse of household member when "[a]lternative evidence of [a prior] assault incident, which the State was allowed to present, was

---

[11] The dissenting opinion of Justice Nakayama notes the obvious proposition that "neither the trial court nor the appellate court should dictate the exact wording of a complaining witness's testimony or reframe how the State presents its case." Dissent at 18 n.7. However, as the dissent acknowledges, "it is the trial court's duty to exclude unduly prejudicial testimony[.]" Id. Thus, in comporting with the court's mandate, the prosecutor should have elicited the evidence in a manner that would not have resulted in the admission of unduly prejudicial evidence. We recently observed in State v. Williams, a case in which the trial court had excluded evidence of the involvement of Child Welfare Services (CWS), that when the State chose to call a detective and social worker to testify, "the State should have been careful not to elicit evidence" regarding involvement of CWS and "should not have asked [the doctor] whether she had alerted authorities to elicit her response that [CWS] had been contacted." 146 Hawai'i 62, 73, 456 P.3d 135, 146 (2020); cf. State v. Miyasaki, 62 Haw. 269, 284 n.15, 614 P.2d 915, 924 n.15 (1980) ("The prosecutor is obviously in a position to tailor his questions, consciously or otherwise, on the basis of his knowledge of the defendant's prior testimony and can do so without any overt reference to the testimony given under immunity."); Am. Bar Ass'n, Criminal Justice Standards for the Prosecution Function § 3-6.6(d) (4th ed. 2017) ("The prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible, whether by offering or displaying inadmissible evidence, asking legally objectionable questions, or making impermissible comments or arguments.").

more efficacious on the issue" and the evidence likely "rouse[d] the jury to overmastering hostility against" the defendant). As our decision in <u>Kazanas</u> recognizes, when there is a demonstrable need to introduce evidence of prior bad acts, admission of such evidence is limited and circumscribed by that necessity. 138 Hawaiʻi at 43, 375 P.3d at 1281.

In this case, any need to provide context as to Gallagher's intent did not make it necessary to introduce evidence of the details of each of the four prior incidents, the Normans' extreme fear, or the extensive countermeasures taken. Nor was the admission of such evidence needed to establish that the charged incident was not a "random" event or to show intent as to the monetary amount of the damage caused, as the dissenting opinions maintain. <u>See</u> Dissent at 17-18, 22; Recktenwald, C.J., Dissenting at 4 [hereinafter C.J. Dissent].

The dissenting opinions also argue that the need for the evidence demonstrates the probative value of the prior incidents because it was the <u>only</u> evidence available to show Gallagher's intent to seriously damage the vehicle. Dissent at 20; C.J. Dissent at 2.[12] The evidence at trial refutes this

---

[12] Professor Bowman has aptly observed in his evidence treatise that the intent inferences of HRE Rule 404(b) require critical examination:

(continued . . .)

contention.  Ms. Norman testified at trial that Gallagher hit the car approximately fourteen to sixteen times, described the dents in the car as "massive," and stated Gallagher's kicks and punches were so loud she thought he was using a baseball bat. Also presented were Mr. Norman's observations of the damage, video evidence showing Gallagher as he caused the damage with an accompanying narrative by Ms. Norman, photographs depicting the damage, and the testimonies of Yoshizawa and Little, who assessed the value of the damage to the truck.  All of this evidence was not only used to show Gallagher's intent, but it was significantly more probative of his intent on the night he caused the damage than Ms. Norman's observations of Gallagher's prior conduct in the preceding weeks and months that did not involve property damage.[13]

---

(. . . continued)

> Because mens rea is an element of the prosecution's case-in-chief in most criminal cases, the intent inferences of rule 404(b) require analytical rigor. . . .
> Analytical rigor is required because nearly all crimes contain a mens rea element and the intent inference, arguably applicable whenever the prior crime is of the same type, could easily swallow the character exclusion.  The key to analysis of criminal intent is a careful application of the need factor[.]

Bowman, supra, § 404-3[2][G], at 4-56 (emphases added).

[13]     Justice Nakayama's dissent argues that the extensive evidence in this case was ineffective to show Gallagher's intent because he denied kicking the vehicle hard or many times and intending to cause more than $1,500 worth of damage.  Dissent at 22.  To reach this conclusion, the dissent summarily discounts the Normans' eyewitness testimony of Gallagher's actions during the incident, their subsequent observation of the damage to the vehicle, the video recording of the incident introduced into evidence and

(continued . . .)

Thus, the evidence adduced at trial in this case demonstrates there was little need, and even less probativeness, for the detailed testimony about each of the prior incidents, the safety measures taken by the Normans, and the fearful reactions by the Normans to Gallagher's conduct because alternative methods of proof were equally efficacious and less unfairly prejudicial. These factors, the need for the evidence and the availability of alternative evidence on the same point thus weigh strongly against the testimony's admissibility.

As to the final HRE Rule 403 factor, the likelihood that the evidence will inspire ill-will in the jury toward the defendant, the number of prior incidents and the involved circumstances had a high potential to "rouse the jury to overmastering hostility" against Gallagher. Behrendt, 124 Hawai'i at 106, 237 P.3d at 1172 (quoting Renon, 73 Haw. at 38, 828 P.2d at 1273). The jury heard detailed testimony from Ms. Norman regarding Gallagher's erratic behavior on prior occasions, which consisted of angry gestures and profane language toward her. Ms. Norman also testified that the prior

---

(. . . continued)

observed by the jury, and the testimony of the State's two expert witnesses as to the damage. If the alternative evidence in this case was held to be insufficient to address the purported need to show an intent inference, then the effect of such a precedent would be to "swallow the character exclusion." Bowman, supra, § 404-3[2][G], at 4-56.

incidents terrified her, that she filed six police reports against Gallagher, and that she and Mr. Norman took measures--such as tinting windows of their home and installing surveillance and alarm systems--in response to Gallagher's prior harassment. The testimony was virtually certain to elicit from the jury strong sympathy for the Normans and animus toward Gallagher for the fear and unwarranted disruption Gallagher's ongoing behavior had caused in the Normans' lives--and Ms. Norman in particular.[14]

This extremely prejudicial effect was likely exacerbated by the State's focus on the past incidents in its opening statement and closing argument. The State repeatedly

---

[14]    Justice Nakayama's dissent dismisses the unfairly prejudicial effect of this evidence by drawing an inapt comparison to our decision in Behrendt. See Dissent at 24-25. In that case, we concluded the prior bad acts involved conduct that "was of the same general type" as the alleged crime and therefore unlikely to rouse the jury to overmastering hostility. Behrendt, 124 Hawaiʻi at 107, 237 P.3d at 1173. In contrast, none of the previous incidents here involved property damage--the crime for which Gallagher was charged in this case--but rather obscene language and gestures, which communicated to the jury, as the dissent describes, "an escalating pattern of extreme aggression toward a specific couple." Dissent at 17. The dissimilar prior misconduct in this case plainly "carried with it the potential to rouse the jury to overmastering hostility against" Gallagher and thus violated HRE Rule 403. Kazanas, 138 Hawaiʻi at 43, 375 P.3d at 1281 (concluding that evidence of the defendant's prior physical acts were not similar to the acts alleged in that case and created the potential of overmastering hostility towards the defendant, and thus the trial court abused its discretion in performing the HRE 403 balancing test).
    Additionally, the prior misconduct in Behrendt was admitted to show the defendant's development of "a relationship of trust and control" over the minor, and to explain both the delayed reporting of the sexual abuse and when the abuse began. Behrendt, 124 Hawaiʻi at 107-08, 237 P.3d at 1173-74. The dissent thus draws an incongruous comparison of the circumstances in Behrendt to those in this case and does not properly consider the availability of alternative evidence to prove the matter for which the misconduct evidence was offered in the two cases. See Dissent at 24-25.

emphasized that "[t]his was not an isolated incident" and focused on the extensive countermeasures the Normans had taken in response to the prior events, expressly stating that it had introduced this evidence to show the Normans' perception of Gallagher. The State argued that Gallagher "was becoming more dangerous each time he showed up," seeming to encourage the jury to consider whether convicting Gallagher would prevent him from causing more harm. The possible future threat Gallagher posed was also irrelevant to whether the elements of criminal property damage in the second degree were met by Gallagher's conduct. This factor therefore also weighs heavily against admittance of the prior incidents.

Justice Nakayama's dissent places much reliance on the ability of the limiting instructions given by the court to cure the potential for the jury's improper use of the evidence of prior bad acts because "it will be presumed that the jury adhered to the circuit court's instruction." See Dissent at 19 (quoting State v. Kassebeer, 118 Hawai'i 493, 519, 193 P.3d 409, 435 (2008)). However, the ability to cure potential misuse of the evidence with a limiting instruction presupposes that the court correctly instructed the jury as to the evidence's proper use.

The requirement to issue a legally correct limiting instruction derives from "the trial courts . . . duty and

ultimate responsibility to insure that juries are properly instructed on issues of criminal liability."  State v. Adviento, 132 Hawai'i 123, 137, 319 P.3d 1131, 1145 (2014) (citation omitted).  This responsibility is of such importance that it rests upon the court even when a misstatement of law is the result of an improper argument of counsel to the jury.  State v. Espiritu, 117 Hawai'i 127, 143, 176 P.3d 885, 901 (2008) ("[T]he failure to correct misstatements of law by a prosecutor may result in reversal of a defendant's conviction."); State v. Basham, 132 Hawai'i 97, 111, 319 P.3d 1105, 1119 (2014) (holding that a prosecutor's misstatement of the law was not cured where no specific curative instruction was given relating to the misstatement that was given).  Similarly, a court's limiting instruction to the jury is also ineffective when it incorrectly instructs the jury about the limited use of admitted evidence. As provided by HRE Rule 105 (1993), "When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."  (Emphasis added.)

This court recently addressed the importance of providing a proper limiting instruction to the jury.  In State v. Lavoie, the trial court ruled that prior acts of abuse were admissible to rebut the defendant's penal responsibility and

34

extreme mental or emotional disturbance defenses, but the court's limiting instruction informed the jury that the evidence could be considered on the defendant's intent to commit the offenses.[15] State v. Lavoie, 145 Hawai'i 409, 428-29, 453 P.3d 229, 248-49 (2019). We held that the instruction was an incorrect statement of the issues on which the trial court had ruled the prior bad acts were relevant, as it allowed the jury to consider the prior bad acts for a purpose other than that for which they had been admitted. Id. at 429-30, 453 P.3d at 249-50. Thus, we determined that the trial court had improperly instructed the jury on the use of the prior misconduct evidence. Id.[16]

In this case, Gallagher duly requested a limiting instruction, and the court was required to "restrict the evidence to its proper scope." Instead, the court informed the jury that Gallagher's prior acts could be considered in determining "the issue of the Defendant's motive to commit the offense charged, opportunity to commit the offense charged, . . . preparation to commit the offense charged, plan to commit

---

[15] The trial court in Lavoie, as in this case, read the limiting instruction multiple times to the jury during the course of the trial. Lavoie, 145 Hawai'i at 429, 453 P.3d at 249.

[16] We concluded that it was unnecessary to determine whether the limiting instruction was "plainly erroneous" in light of our disposition of other issues in the case. Lavoie, 145 Hawai'i at 429 n.36, 453 P.3d at 249 n.36.

the offense charged, and identity of the person who may have or allegedly committed the offense charged."  This instruction, given twice, was plainly incorrect.

The prior incidents should not have been considered by the jury for Gallagher's motive, opportunity, preparation, or plan because Gallagher's identity as the person who committed the charged offense was not in dispute.  See Castro, 69 Haw. at 645, 756 P.2d at 1042 (when "the identity of the perpetrator of the crimes was not denied, [] the admission of the other crimes evidence as proof of modus operandi," including plan and preparation, "cannot be justified").  Instead of curing or limiting any potential misuse of the evidence, the court's "limiting" instruction expansively and improperly allowed the jury to consider the prior bad acts in order to prove, for example, that Gallagher had a plan to damage the car, that these prior acts were part of his preparation to commit the crime charged, and that the prior incidents of misconduct related to Gallagher's motive for the offense.[17]  See Lavoie, 145 Hawaiʻi at

_____

[17]    Justice Nakayama's dissent fails to recognize the substantial risk of the jury misapplying the prior misconduct evidence as a result of the court's flawed limiting instruction--hypothesizing that the jury considered the evidence only for issues not in dispute--and thus concludes that the instruction was harmless.  Dissent at 19-20 n.9.  But it is precisely because the limiting instruction failed to restrict consideration of the evidence to the purpose for which it was admitted while specifically allowing the jury to consider the misconduct evidence for issues not relevant to the charge, such as plan, preparation, and motive to commit the charged offense, that the prejudice to Gallagher from the prior misconduct evidence was exacerbated.

(continued . . .)

430 n.39, 453 P.3d at 250 n.39 (trial court erred by not tailoring the limiting instructions to the specific matters for which the prior bad acts were deemed relevant).

Not only were plan, preparation, and motive not elements of the crime, but as Gallagher's counsel argued to the court during the motions in limine and at trial, because identification was also not in issue, the introduction of the prior incidents would confuse and mislead the jury. It was incumbent upon the court to issue a limiting instruction that properly instructed the jury as to the legitimate uses of the prior incidents after the court admitted the misconduct evidence, particularly in light of its great potential for misapplication by the jury. See HRE Rule 105 (requiring the court, when requested, to restrict admitted evidence to its proper scope). We have repeatedly emphasized that it is the trial court's duty to properly instruct the jury on the applicable law, and that once instructional error is demonstrated, the judgment will be vacated if the erroneous instruction was not harmless beyond a reasonable doubt. See,

(. . . continued)

Castro, 69 Haw. at 645–46, 756 P.2d at 1042 (holding there was "no [] basis to consider the evidence admissible under the rubric of 'preparation'" or plan, and "the potential for unfair prejudice being generated by the evidence was far greater than its value in establishing facts of consequence to the determination of the case").

e.g., State v. Taylor, 130 Hawai'i 196, 204-08, 307 P.3d 1142, 1150-54 (2013); State v. Kikuta, 125 Hawai'i 78, 95, 253 P.3d 639, 656 (2011); State v. Stenger, 122 Hawai'i 271, 281, 226 P.3d 441, 451 (2010). Thus, the dissent's reliance on the court's limiting instruction, see Dissent at 19, is misplaced because it improperly instructed the jury that the evidence of bad acts could be considered in determining Gallagher's motive, opportunity, preparation, or plan to commit the offense charged.

Upon hearing the evidence of the prior incidents in this case, the jury likely "prejudge[d]" Gallagher based on "a bad general record" of interactions with the Normans and "den[ied] him a fair opportunity to defend against" the specific charge of criminal property damage in the second degree. Castro, 69 Haw. at 645, 756 P.2d at 1042 (quoting Michelson v. United States, 335 U.S. 469, 476 (1948)); accord Kazanas, 138 Hawai'i at 43, 375 P.3d at 1281 (holding that the improper admission of a prior domestic abuse offense against a vulnerable victim could have roused the jury to overmastering hostility against the defendant). "On balance, the potential for unfair prejudice being generated by the evidence was far greater than its value in establishing facts of consequence to the determination of the case." Castro, 69 Haw. at 645-46, 756 P.2d at 1042. Thus, the circuit court abused its discretion in

finding that the prejudicial effect of the prior incidents did not substantially outweigh their probative value.

Recognizing that the admission of the extensive details pertaining to the prior incidents was "highly prejudicial" and clearly inadmissible, the Chief Justice's dissent argues that Gallagher failed to preserve his objection to this evidence and thus "waived" an objection to its introduction. C.J. Dissent at 6-7. The basis for this flawed contention is that Gallagher did not object to what the Chief Justice's dissent calls "impact testimony" as to the four prior incidents.[18]

In this case, Gallagher objected to the admission of the evidence regarding the four prior incidents <u>five</u> separate times: in the written motions in limine, during the hearing on the motions in limine and in opposition to the State's notices of intent, in the State's opening statement, and during Ms. Norman's testimony when she was about to testify regarding

---

[18] The Chief Justice's dissent identifies the "impact testimony" as including

> the Normans' repeated calling of police regarding the incidents; their filing of six police reports involving harassment; the numerous protective measures installed in their home, including the tinting of windows and the installation of a surveillance system with seven video cameras and an alarm system; and – perhaps most prejudicial – the recounting of the Normans' ongoing fear of Gallagher and Ms. Norman's statement that the prior incidents terrorized her.

C.J. Dissent at 6.

the prior incidents.  Nonetheless, the "impact testimony" theory faults the specificity of Gallagher's multiple objections, positing an artificial distinction between an objection relating to conduct and one relating to the results of that same conduct. Under this theory, Gallagher waived his objection to the "impact testimony" because, while he objected to the introduction of evidence of his actions in the various incidents, he did not specify that he was also objecting to the reactions of the Normans to his actions.  C.J. Dissent at 6-15.

However, the very substance of Gallagher's objections clearly indicates that Gallagher's objections were not restricted only to his conduct during the prior incidents.  In Gallagher's written motions in limine, he requested an order excluding "testimonial or documentary" evidence "<u>relating to</u> any other 'acts', bad or otherwise involving the defendant" and specifically "<u>any</u>" such evidence "<u>regarding</u> alleged incidents involving the Complaining Witnesses and/or other person" on the four dates.  (Emphases added.)  This objection manifestly included the evidence characterized by the Chief Justice's dissent as "impact testimony" (e.g., the Normans' repeated calling of police regarding the incidents; their filing of six police reports involving harassment; Ms. Norman's statement that

the prior incidents terrorized her), as the evidence was "relating to" and "regarding" the prior incidents.[19]

The "impact testimony" theory is further refuted by the very nature of the prior incidents that the State sought to introduce, which the State identified in its notices of intent as harassment or harassment by stalking incidents.  These offenses, as they pertain to this case, requires the victim to "reasonably believe[]" that the actor intends to cause bodily injury to the victim or damage to their property.  See HRS §§ 711-1106(1)(a), (f) (2014), 711-1106.5 (2014).  Thus, by definition and by their inherent nature, the underlying conduct of these offenses directly involved "impact" upon Ms. Norman, particularly her fear that directly resulted from Gallagher's actions.  Therefore, Gallagher's objections to the prior incidents listed in the State's notices of intent because the incidents were irrelevant and unduly prejudicial included the reactions of the Normans that related to or involved the reported harassment.

The State in fact expressly noted in the pretrial hearing that it intended to show "an escalating series of

---

[19]    Indeed, had the court granted Gallagher's motion to preclude any evidence regarding the prior incidents, under the analysis of the Chief Justice's dissent, the State would nevertheless have been allowed to elicit "impact testimony" from Ms. Norman, such as her reporting of the six incidents to the police and that the prior incidents terrorized her.

events" and that it would seek to elicit evidence regarding the harassment incidents, including the threating nature of Gallagher's visits and the resulting extensive countermeasures the Normans undertook.

> [COUNSEL]: . . . . [Gallagher] just started appearing at our complaining witness's house, essentially taking them to the point where they had to get a protective order against him, installed a video surveillance system on their house, basically because he had come around so many times threatening them[.]

It is clear that testimony surrounding the incidents that the State sought to introduce included the results of Gallagher's threatening behavior, which at a minimum had "tak[en] [the Normans] to the point where they had to . . . install[] a video surveillance system."[20]  There is no question that the State correctly concluded that the circuit court had ruled that Ms. Norman could testify as to her reactions during and to the

---

[20]     The Chief Justice's dissent points to other statements made by the prosecutor during the motions in limine hearing to support its position that the prior misconduct sought to be admitted by the prosecutor only pertained to Gallagher's actions and not the results of his actions upon the Normans.  However, even in the description of the incidents that the dissent relies upon, the prosecutor recounted to the court that Ms. Norman "observes the defendant outside of her house again being aggressive, yelling profanities at her," that Ms. Norman "reports harassment," "reports again to the police that this is the same individual," and "files a police report." Additionally, in the prosecutor's written notices of intent, the incidents were identified as four incidents of harassment and two of harassment by stalking.  It is unmistakably clear that the prosecutor sought to introduce not only actions by Gallagher in the incidents but the Normans' reactions to his conduct, including the fear they engendered, the numerous police reports filed, and the protective measure cited by the prosecutor.  If the prosecutor had intended otherwise, as the Chief Justice's dissent maintains, its admission would have minimized Gallagher's conduct by considering his actions as something separate from their effects on the Normans.

incidents since her reactions prompted the phone calls to police, the filing of police reports, and the necessity for the video surveillance system.[21]  And there is also no question that Gallagher's objections to the evidence "regarding" or "relating" to the prior incidents likewise sought to exclude this testimony.

Indeed, the illogicality of distinguishing between objections to the conduct and the impact of that conduct has its own implications.  As the Chief Justice's dissent aptly notes, the State's notices of intent did not expressly advise that it intended to introduce the resulting "impact" occasioned by the harassment incidents, and it is partially for this reason that the dissent concludes that Gallagher's objections to these incidents were ineffectual in preserving objections to this evidence.  See C.J. Dissent at 9.  Yet, it is clear that the prosecutor intended to and did, in fact, elicit Ms. Norman's "impact testimony."  Thus, under the Chief Justice's analysis, the State engaged in prosecutorial misconduct by failing to provide reasonable notice of its intent to adduce "impact" evidence of Gallagher's "other crimes, wrongs, or acts," which falls squarely within HRE Rule 404(b).  See HRE Rule 404(b) ("In

_____

[21]  The State's understanding of the trial court's ruling is abundantly clear from its opening statement when it provided a wholesale description of the prior incidents, inclusive of their resulting impacts.

criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial."); State v. Underwood, 142 Hawai‘i 317, 325 n.12, 418 P.3d 658, 666 n.12 (2018).  Thus, under the Chief Justice's analysis, we would be compelled to find that the prosecutor's misconduct in failing to provide notice of its intention to adduce "impact evidence" was "highly prejudicial" and deprived Gallagher of a fair trial.

It is noted that the "impact testimony theory" was never advocated by the State at trial or raised on appeal, is contrary to the approach our courts have long applied, and is not part of our evidence law.  Additionally, the artificial distinction between actions and their effects would create difficult problems for counsel and the court in its application.  Prosecutors and defense attorneys--and the courts in their rulings--would be required to dissect the series of events in any misconduct incident to distinguish between the actions of the defendant and the effects of those actions, parceling out such matters as the victim's reactions to the conduct, the resulting fear or injuries from the conduct, and defensive responses taken during the incident.  We thus reject the "impact testimony" theory propounded by the Chief Justice's dissent.

44

In summary, it is clear that Gallagher properly preserved his objection to the testimonial evidence regarding the prior incidents, including the unduly prejudicial testimony of the extensive surrounding details elicited from Ms. Norman.[22]

Finally, the Chief Justice's dissent acknowledges the HRE Rule 404(b) principle that "whether or not the proffer survives the [HRE] rule 403 balance may well depend on whether

---

[22] It is noted that this court has previously rejected the "waiver" analysis that the Chief Justice's dissent advocates in an analogous context. In State v. Schnabel, the petitioner sought to prevent the State from eliciting evidence of petitioner's juvenile proceedings, arguing that the evidence was not relevant and that its probative value was substantially outweighed by the risk of prejudice. 127 Hawai'i 432, 457–58, 279 P.3d 1237, 1262–63 (2012). We held that the circuit court had erred in allowing the evidence to be introduced because HRS § 571-84(h) barred the introduction of such evidence, and further concluded that petitioner had not waived the argument by failing to specify the statute in its objection. As we explained in Schnabel,

> "Case law from our state indicates . . . that the purpose of requiring a specific objection is to inform the trial court of the error." State v. Long, 98 Hawai'i 348, 353, 48 P.3d 595, 600 (2002). However, Long explained that an appellate court will "consider a meritorious objection not voiced to the trial judge" when "the ground for exclusion should have been obvious to [the] judge and opposing counsel[,]" 98 Hawai'i at 354, 48 P.3d at 601 (internal quotation marks, citation, and emphasis omitted) (emphasis added). Although Petitioner did not specifically raise HRS § 571-84(h), its applicability should have been "apparent from the context[,]" HRE Rule 103(a)(1) of Petitioner's objection.

Id. at 458, 279 P.3d at 1263 (alterations in original). As stated above, Gallagher clearly informed the court that he sought to preclude "any testimonial or documentary evidence regarding the alleged incidents" and repeatedly objected to the State's introduction of the incidents as irrelevant and unduly prejudicial. Even assuming Gallagher's objections were not specific enough to include the Normans' reactions to his conduct, which they were, it should have been obvious to the court that Gallagher's objections were not limited to his conduct during the incidents, but rather they included "any" testimony "regarding" or "relating" to the prior incidents.

or not the matter is in dispute[, which requires] consideration of the precise defensive claims being made in the case." C.J. Dissent at 4 (alterations in original) (quoting Addison M. Bowman, Hawaii Rules of Evidence Manual § 404-3[3][D], at 4-60 (2016-2017 ed.)). Both dissents, however, contend that because a juror submitted a question regarding Gallagher's identity, that question essentially demonstrated his identity was disputed, which in turn rendered Gallagher's prior conduct as "relevant and admissible." C.J. Dissent at 5.[23] In their efforts to portray identity as a disputed issue that did not exist at trial, the dissents seek to establish and apply a new legal principle that juror questions submitted during trial can be utilized to evaluate the validity of evidentiary rulings. This approach is fundamentally flawed.

Under the dissents' theory, a juror's question that comes before other witnesses are called to testify on the "disputed" matter or before other physical evidence is introduced may be determinative of the admissibility of HRE Rule 404(b) evidence. The juror question relied upon by the

_____

[23] Like Justice Nakayama's dissent, the Chief Justice's dissent points to the fact that because Gallagher did not stipulate to the elements of the offense, the State's burden of proof provided a basis for admission of the HRE Rule 404(b) misconduct evidence. C.J. Dissent at 4. The contention that an unstipulated element renders the element in dispute for purposes of HRE Rule 404(b) analysis is contrary to our caselaw, conflicts with settled evidentiary principles set forth in Professor Addison Bowman's treatise, and would effectively nullify the restrictions of HRE Rule 404(b). See supra note 9.

dissents, which occurred at the conclusion of Ms. Norman's testimony, was the following: "Can the Defendant be positively identified that it is really him?" C.J. Dissent at 5; see Dissent at 14 n.5. However, even if consideration of jury questions were permissible to review evidentiary rulings, the obvious problem with the dissents' reliance on this question to show a disputed issue of identity is that the question was posed prior to Mr. Norman's testimony and prior to the defense case when Gallagher testified to his actions during the incident. In Mr. Norman's subsequent testimony, he identified Gallagher in court, described Gallagher's movements during the night of the incident, and stated that Gallagher caused the damage to the vehicle depicted in photographs published to the jury. In Gallagher's testimony, he unequivocally testified that he was the person who had kicked the vehicle.

The issue of identify was unquestionably not disputed at trial, and it did not become disputed as a result of a juror question about the certainty of a witness' identification that occurred before evidence in the case was concluded. Yet, under the dissents' hypothesis, the substance of questions posed by jurors is a factor to be considered when determining questions of the admissibility of evidence under HRE Rule 404(b). This rationale merely reflects the absence of a legally valid reason given by the dissents for the admission of the prior misconduct

47

evidence. And absurdly, a juror's question that comes before other witnesses are called to testify on the "disputed" matter or before other physical evidence is introduced may be determinative of the admissibility of HRE Rule 404(b) evidence.[24] Under this approach, the State would benefit from a prosecutor's deficient direct examination that results in juror questions to clarify a witness' testimony, which then incongruously provides a basis for admission of misconduct evidence.

It is noted that the novel approach of the dissenting opinions, that an appellate court may use a juror question to review the legal propriety of an evidentiary trial ruling (and perhaps other rulings as well), was neither argued nor raised by the State. But even assuming that legal principles permitted juror questions to be used to support an evidentiary ruling (which they emphatically do not), by the same logic, juror questions could also be used to show that a prior evidentiary ruling was erroneous.[25] Trial judges would then be placed in the

---

[24] The Chief Justice's dissent asserts agreement with this opinion that juror questions do not determine the admissibility of evidence under HRE Rule 404(b). But, because it is undisputed that the evidence as to identity was not contested, the juror question remains the only basis the dissents point to for admission of the misconduct evidence. As stated, the absence of a stipulation does not make an undisputed element of an offense disputed, nor does it provide a vehicle to circumvent our settled law on HRE Rule 404(b). See authorities and caselaw discussed supra note 9.

[25] Indeed, one juror question asked, "Was this the first time the defendant caused property damage against the Normans?" Applying the dissents' reasoning, this question would firmly support Gallagher's

(continued . . .)

position of having their evidentiary rulings upended by the substance of questions submitted by jurors. Consequently, a trial court would need to be ready to reconsider its prior evidentiary rulings based on jury questions, and appellate courts would be required to evaluate both the initial evidentiary ruling of the trial court and its response to a juror question as it relates to the earlier ruling. This underscores the problematic nature of the proposition advocated by the dissents.

In summary, the reliance by the dissents on the juror question regarding "identity" is flawed because the evidence at trial unquestionably demonstrated that identity was not in dispute, under well-settled legal principles the admissibility of HRE Rule 404(b) evidence is not supported or refuted by the substance of a juror question, and even assuming such a principle existed in our law, neither the State's nor the defense's evidence had been completed at the time the question was posed.

---

(. . . continued)

contention that because none of the prior incidents involved property damage, they should have been excluded as having virtually no probative value to the only issue in this case--Gallagher's intent regarding the amount of property damage caused to the Normans' vehicle--and thus their admission violated HRE Rule 403.

## B. The Circuit Court's Error Was Not Harmless.

"In applying the harmless beyond a reasonable doubt standard[,] the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Mundon, 121 Hawai'i 339, 368, 219 P.3d 1126, 1155 (2009) (alterations in original) (quoting State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)).

This is not a case "[w]here there is a wealth of overwhelming and compelling evidence tending to show" beyond a reasonable doubt that Gallagher intended or knew that his actions would cause over $1,500 in damage to the Normans' property. State v. Rivera, 62 Haw. 120, 128, 612 P.2d 526, 532 (1980). Although the repair estimates presented by the State may initially suggest that it was manifest that the damage exceeded $1,500, the amount of divergence between the estimated amounts demonstrates the difficulty of objectively gauging the cost of automotive repairs. Yoshizawa, the mechanic who testified for the State, asserted that the repairs would cost $4,583.04. In contrast, Little, an automotive damage specialist for the Normans' insurance company, estimated the damage at $3,036.26--$1546.78 less than Yoshizawa. If the estimates of two trained specialists varied to such a degree, it can hardly be said beyond a reasonable doubt that Gallagher was aware the

damage he was causing was likely to exceed $1,500 simply from viewing it as it occurred.

The State's other evidence on the issue consisted primarily of visual depictions of the incident and its aftermath and testimony of the Normans' perception of the event. The State introduced two video recordings that showed Gallagher running up to and flailing at the Normans' vehicle without clear purpose or direction. The State also presented the testimony of Mr. Norman, who testified that he saw multiple dents on the vehicle after the incident on September 15, 2013, and identified a series of photographs that depicted the damage to the vehicle that was allegedly caused by Gallagher. The State published the photographs to the jury and entered them into evidence; they do not appear to clearly depict extreme damage and show that the truck had many preexisting scratches and scuff marks.

In contrast, Gallagher testified that he had kicked the truck with only the inside of his foot and that the incident lasted a total of only ten seconds. Gallagher said that he was 5 feet 9 inches tall and weighed 160 pounds and that he was wearing a pair of cross-trainers during the incident. He indicated that he had only "put a couple scuff marks on the truck," which would have amounted to $300 or $400 in damage, requiring only a "detail job to buff it out" or a "wax job" to repair. Gallagher stated that he did not intend to do extensive

damage to the vehicle. Given this balance of evidence, the jury's determination essentially turned on whether they credited Gallagher's testimony regarding the extent of the damage he intended to cause and was aware he was causing, and this assessment could have been colored by the dramatic details of the prior incidents.

Further, the prejudicial testimony may have led the jury to decide the case on considerations completely independent of the charged offense. The jury may have viewed the entire course of Gallagher's conduct as a continuing campaign of harassment against the Normans that they could end by convicting him. And the jurors may have decided the case based not on the amount of damage Gallagher intended to cause during the charged incident, but rather a desire to relieve the Normans of the ongoing hardship of constantly dealing with Gallagher's misconduct toward them and the extreme fear that it caused them.

"Unfair prejudice 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Kaeo v. Davis, 68 Haw. 447, 454, 719 P.2d 387, 392 (1986) (quoting Advisory Committee's Note to Federal Rules of Evidence 403); see HRE Rule 403 cmt. (specifying that a form of unfair prejudice is the evidence's "potential for engendering" the jury's emotions, such as "hostility[] or sympathy"). Because we do not conclude that the wrongfully

admitted testimony did not color the jury's perception as to whether the elements of the offense were met or lead the jury to decide the case on a basis unrelated to those elements, there is a reasonable possibility that the error contributed to Gallagher's conviction.  The error was therefore not harmless beyond a reasonable doubt.

### V.    CONCLUSION

Based upon the foregoing, we vacate the ICA's judgment on appeal, vacate the circuit court's judgment of conviction and sentence, and remand the case for further proceedings consistent with this opinion.

Cynthia A. Kagiwada                    /s/ Sabrina S. McKenna
for petitioner
                                       /s/ Richard W. Pollack
Peter A. Hanano
for respondent                         /s/ Michael D. Wilson

